[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this highway condemnation case, the state on January 14, 1993, acquired a strip of land owned by the plaintiff on the east side of existing Buckland Road in South Windsor. The CT Page 5193 land taken measures approximately 519 feet along the road and comprises 0.217 acre. In addition the state took a permanent easement along the banks of a brook that flows through the plaintiff's property and then under the bridge supporting Buckland Road. The land affected by this easement comprises 0.064 acre and its purpose is to allow deepening of the brook channel by excavation, construction of concrete wingwalls for the highway bridge, placement of riprap along the brook, and removal of material excavated in connection with the project. The state also acquired a permanent easement to slope for support of the highway and to install end anchorages within an area of 0.063 acre extending along the easterly boundary of the land taken in fee, which borders existing Buckland Road. Temporary rights were taken over 0.124 acre for a work area, a sedimentation control system, reconstruction of a driveway, and resetting a fence, which will terminate on completion of the project. (Ex. A, B)
The entire tract of land owned by the plaintiff consists of 14.4 acres, through which flows a stream bearing the picturesque appellation, Plum Gully Brook. All but a small portion of the property is situated in the AA-30 residential zone. The remainder consists of two separated triangular pieces within the wetlands area that are included in the restricted commercial zone. Approximately 60 percent of the acreage is classified as wetlands, according to the South Windsor Inland Wetlands map. (Ex. 1)
The plaintiff, who purchased the property in 1970, has been using it for the purpose of grazing cattle, which he keeps in an old barn on the property during the winter months. The taking has affected his present use of the property by reducing the area available for grazing by the 0.217 acre taken and the 0.064 acre subject to the easement along a portion of Plum Gully Brook, the banks of which have been riprapped and are much steeper than before the condemnation. The slope easement over 0.063 acre for support of the widened Buckland Road has resulted in a slightly steeper decline from the road to the remaining land, because the highway has been elevated by approximately three inches. As shown in exhibit C (p. 9), the slope from the highway was more gradual before the reconstruction of Buckland Road.
Although the widening of the highway has had some adverse physical impact on the plaintiff's current use of his CT Page 5194 remaining land for cattle grazing, the only evidence presented as a basis for his claim of damages assumes that the land will be used for residential purposes. Both the plaintiff's appraiser, Peter Marsele, and the state's appraiser, Brian Marchi, agree that the highest and best use of the property would be to develop it for residential purposes and they have calculated the damages accordingly. The plaintiff's testimony about his concern over the effects on his cattle business of the steeper slope from the newly elevated Buckland Road and the riprapping of Plum Gully Brook do not provide the basis for an award of damages.
Similarly, the testimony about the possibility of a change from a residential to a restricted commercial zone for the plaintiff's land is inadequate to support any enhancement in the value of the land based upon the probability of such a change of zone in the near future. See Ruschak v. West Haven,167 Conn. 564, 569-72 (1975); Budney v. Ives, 156 Conn. 83,88-90 (1968)[.] The only evidence of a future zone change is a reference in Marchi's report (Ex. 2, p. 2) to his conversation with Michele Lipe, the assistant town manager for South Windsor, who indicated that the trend for the locale was "up for commercial occupancy" but "static for residential occupancy."
Reference was also made to a decision of this state trial referee in No. CV9305242, RSK-KELLCO v. Commissioner ofTransportation, in which it was found that a change to a commercial zone was reasonably probable in the near future for a strip of land approximately 200 feet wide with frontage of about 400 feet on Buckland Road located about 800 feet south of the subject property on the other side of an intersecting street, Deming Street. Such a zone change, however, would be of little benefit to the plaintiff's property, even if it were extended to the north of Deming Street. The only buildable portion of the plaintiff's land is situated more than 200 feet from Buckland Road. Furthermore, both appraisers testified that the classification of the frontage of the plaintiff's property as wetlands would preclude access from Buckland Road for commercial purposes even if a zone change for the buildable land could be obtained.
The South Windsor wetlands regulations (EX. E, p. 5) require a special permit for any activity, even construction of an access road, within an area classified as wetlands, such CT Page 5195 as the entire frontage of the plaintiff's property along Buckland Road. It is unlikely that such a permit could be obtained for a commercial use of the property. A purchaser, therefore, would probably not pay any more for the plaintiff's land than its potential for a residential development would warrant. Both appraisers implicitly reached this conclusion by valuing the property on the assumption that a residential development would constitute its highest and best use.
Marsele, the plaintiff's appraiser, estimated the damages from the taking at $14,600, of which $9400 was attributed to a decrease in land value and 5200 to a decrease in the value of a building used for a garage and also for an office occupied by the plaintiff. The decrease in land value was calculated by using a unit price of $37,000 per acre for the entire tract, 60 percent of which is conceded to be wetlands, as shown in exhibit 1. Marsele's calculation of damages may be recapitulated in a simpler format as follows:
 Fee taking 0.217 acre x $37000 = $8029.00 Drainage 0.064 acre x $18500 = 1184.00 Other Eas. 0.009 acre x $18500 = 166.50 -------- Total damages to land: $9379.50 Reduction in garage value (50%) resulting from nonconformity $5200.00 ------- Total damages: $14579.50
Marchi, the state's appraiser, estimated the damages at $6550 for the decrease in the value of the land, but made no allowance for a reduction in the value of the garage building that has resulted from the taking. The South Windsor zoning regulations require a front yard with a minimum depth of fifty feet in the residential AA zone. (Ex. D, p. 159, Sec. 10.2) The regulations allow the continuation of existing uses of a nonconforming building, but impose restrictions on its enlargement and reconstruction that would affect the market value of the garage unless the purchaser were interested in continuing its present use. (Ex. D, p. 13, Sec 3.10)
Marchi used $22,000 per acre as his unit value. His calculation of $6550 as the damages for the taking is based on a $6000 reduction in the value of the land for the loss of 0.217 acre taken in fee as well as the effect of the permanent CT Page 5196 easements, plus $550 for the temporary work area easement affecting 0.124 acre for two years.
The principal difference between the two appraisals involves the unit value of the land, Marchi's $22,000 per acre and Marsele's $37,000 per acre. If sixty percent of the 14.4 acre tract is properly classified as wetlands, .as both appraisers assumed, the plaintiff's land contains 5.76 acres of developable land and 8.64 acres of wetlands. The highest unit price reflected in the six comparable sales used by the appraisers is approximately $40,000 per acre. Applying that unit value to the 5.76 acres results in a value of $230,400 for that portion of the land. The 8.64 acres at a unit value of $10,000 would be worth $86,400. The total value of the entire 14.4 acres would be $316,000, resulting in an average unit value for the entire tract of $22,000, the figure used by Marchi.
Marchi used a unit value of $22,000 per acre in making his valuation, although the average price of the subject property indicated by the adjustments of his three comparable sales is $22,650 per acre. Those sales occurred in 1988, 1989, and 1991. Two of the properties contained wetlands, five percent in one instance and ten percent in the other. Two of the three properties are located within one half mile from the subject property and are in the same zone.
Marsele's three comparative sales are closer in time to the date of taking, January 14, 1993, but there is no evidence that the value of residential land has increased since 1988. The three properties he used in arriving at his unit value are situated west of Buckland Road and are situated much farther from the subject property. The average unit price of his three comparable sales is $27,840 per acre. The average price of the subject property as indicated by these sales after Marsele"s adjustments, however, is $36,742 per acre, the basis for the $37,000 used in his appraisal. He used a twenty percent discount in allowing for the predominance of wetlands on the subject property while Marchi used forty percent. If Marsele had used a forty percent adjustment for wetlands on the subject property, his $37,000 unit value would be reduced to $29,600 per acre.
All things considered, this state trial referee concludes that the fair market value of the plaintiff's land on the CT Page 5197 condemnation date was $25,000 per acre. Accordingly, the damages resulting from the taking are calculated as follows:
 Fee taking: 0.217 acre x $25,000 = $5425.00 Drainage easement: 0.064 acre x $25,000 x 50% = 800.00 Slope easement 0.063 acre x $25,000 x 25% = 393.75 Temp. work easement: 0.124 acre x $25,000 x 20% = 620.00*
In addition, a reasonable allowance must be made for the effect of the taking on the value of the garage-office building, which Marsele appraised at $10,400 on the basis of its replacement cost less depreciation. Marchi made no allowance for damages to that building, because, in his opinion, when the property is eventually developed, the garage as well as the cow barn will probably be removed by the developer. The garage, however, would serve a useful purpose during the period required for development of the land as a construction office or as a place to store equipment or material. Meanwhile, as long as the present use of the land continues, the garage is needed for the purpose of the plaintiff's business. A purchaser interested in continuing the present use of the land or any similar use would also need such a building.
There is no precise method of evaluating the decrease in the value of a building because of its nonconformity with zoning regulations. The South Windsor regulations do not bar the plaintiff from continuing to use the garage in the same manner as before the condemnation. (Ex. D, Sec. 3.10.1, p. 13) The current use can be changed to another use "not more objectionable in character" with the approval of the board of appeals. On the other hand, a nonconforming building cannot be enlarged or extended.
The only evidence of the impact of the nonconformity on the value of the garage was furnished by Marsele, who estimates that a reduction of one half the value of that building has resulted from the nonconformity created by the condemnation. In the absence of other evidence, that estimate seems reasonable and the damages found must be increased by CT Page 5198 the sum of $5200, which represents half of the $10,400 value attributed to the garage. Adding that sum to the damages of $7239 for the effect of the taking on the land results in a total award of $12,439, which is rounded to $12,440. Of that amount, the plaintiff has already received $6500 by withdrawal of the amount deposited at the time of condemnation.
It is ordered that the plaintiff recover of the defendant $5940 as the balance of the damages found, plus interest thereon at a "rate that is reasonable and just" from January 14, 1993, pursuant to General Statutes § 37-3c, together with costs pursuant to General Statutes § 13a-77 and an appraisal fee of $1000, which is reasonable for the services of the plaintiff's appraiser. If the parties cannot agree on the amount of interest, the court will hold another hearing for that purpose.
David M. Shea State Trial Referee